**Joel KATCOFF and Allen M. Wieder, Plaintiffs,**

v.

**John O. MARSH, Jr., Secretary of the Army, et al., Defendants.**

**No. 79 CV 2986.**

United States District Court, E.D. New York, Civil Division.

Feb. 1, 1984.

On Motion to Amend April 9, 1984.

Joel Katcoff, Allen M. Wieder, pro se.

Raymond J. Dearie, U.S. Atty. (Marilyn Go, Patrick B. Northup, Asst. U.S. Attys., Brooklyn, N.Y., Col. John L. Fugh, Major Michael J. Nardotti, Jr., Dept. of Army, Washington, D.C., of counsel), for defendants.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

### INTRODUCTION

Chaplains have been members of the United States Army since the Revolutionary War. Plaintiffs, who brought this action while they were still Harvard law students, have never served in the military. They sue to declare the Army Chaplaincy Program (the "Chaplaincy Program," or the "Program") unconstitutional on the ground that it runs afoul of the First Amendment's command that Congress "shall make no law respecting the establishment of religion." U.S. Const. amend. I.

There are some who might argue that this question is more the grist of a moot court competition than a case or controversy to occupy the energies of a federal court. There is, thus, a threshold question of plaintiffs' standing.[1]

---

1. *See e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,*

For the reasons set forth below, I conclude that there is a case or controversy, and that the plaintiffs do have standing. On the merits, I conclude that the Chaplaincy Program is constitutional. Accordingly, plaintiffs' motion for summary judgment is denied. Defendants' cross-motion for summary judgment is granted.

## PROCEDURAL BACKGROUND

This case was filed in late 1979. Defendants promptly moved for judgment on the pleadings, making three arguments: (1) plaintiffs lack standing to challenge the Program; (2) neither the program, nor its enabling statutes or implementing regulations violate the First Amendment; and (3) plaintiffs' challenge presents a political question shielded from judicial scrutiny.

By Memorandum of Decision and Order, dated August 20, 1980, Judge Mishler denied defendants' motion. The 1982 Supreme Court decision in *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), however, coupled with the completion of extensive discovery, apparently instilled both sides with renewed vigor.

On April 13, 1982, defendants renewed their motion for judgment on the pleadings, or, in the alternative, for dismissal. Plaintiffs countered the very next day with a motion for summary judgment. Defendants, on May 19, 1982, cross-moved for summary judgment. Plaintiffs responded with a brace of memoranda: a Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Standing was filed on June 24, 1982; and a Memorandum in Opposition to Defendants' Motions for Summary Judgment and for Judgment on the Pleadings was filed on October 4, 1982. Defendants had the last word when, on October 21, 1982, they filed a document styled "Defendants' Reply Memorandum of Law in Support of Their Motion in the Alternative for Dismissal, for Judgment on the Pleadings or for Summary Judgment." Also filed throughout the course of this litigation were a Niagara of affidavits, photocopied cases, letters, legislative documents, and law review articles.

Rather than be distracted by the procedural posturings of the parties, I have determined to treat the various motions in this case as motions by each side for summary judgment. Accordingly, all documents that are part of the record have been studied.

## FACTS

The material facts are undisputed, and many were clearly set forth in Judge Mishler's Opinion of August 20, 1980. Accordingly, I need do no more than broadly outline the operation of the Chaplaincy Program.

The Program is authorized by 10 U.S.C. § 3073 (1976), which provides with Olympian generality that "[t]here are Chaplains in the Army." Implemented by a battery of federal regulations, the Program provides payment for, *inter alia*, salaries of Chaplains and other religious personnel, religious facilities, sacred items, religious publications of the Department of the Army, retreats, and the professional education and training of Chaplains. These activities are funded largely from the overall Army budget ("appropriated funds"). Some of the funding for the Chaplaincy, however, is derived from "non-appropriated funds," i.e., voluntary donations made by Army personnel. The distinction is significant because appropriated funds are generally used for inter-denominational purposes, such as religious facilities, while non-appropriated funds are "used in furtherance of the denominational activities." Defendants' Memorandum of Law For Summary Judgment at 15.

The official duties of Army Chaplains (set forth in 10 U.S.C. § 3547 (1976), Army Regulation ("AR") 165–20 and Field Manual No. 16–5) comprise a wide range of activities, including holding religious services,

---

*Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (Standing requirement exists to insure legal questions will not be resolved "in the rarified atmosphere of a debating society.").

providing religious education, and counselling Army personnel.

A cleric who would become a Chaplain must first be approved by an ecclesiastical endorsing agency recognized by the Army. The endorsing agencies are not limited to the largest religious groups in the United States; in fact, according to defendants, there are 47 such agencies, representing 120 denominations. Defendants' Memorandum of Law For Summary Judgment at 19; *see* Defendants' Responses To Plaintiffs' Second Set of Interrogatories.

The religious endorsing agency establishes the theological requirements for those whom it wishes the Army to consider for the Chaplaincy. The religious standing of the Chaplains is left exclusively to the respective religious organizations. The Army, however, establishes minimum educational requirements for Chaplains, and provides them with specialized training, primarily in military subjects. The Army also decides rank promotions, based on the Chaplain's military performance. Defendants' Memorandum of Law For Summary Judgment at 19.

Plaintiffs also cite the Office of the Chief of Chaplains as an entity inextricably tied to religious organizations. Plaintiffs are most troubled by the Ecclesiastical Relations Division, and the Administration and Management Division of the Chaplains' Office (the "Office"). The latter acts as a liaison between religious and secular organizations and media. Defendants' Admission No. 94. Further, the Conference of Ecclesiastical Endorsing Agents for the Armed Forces appears on the organizational chart of the Chaplains Board. Defendants' Admission No. 102.

Defendants do not quarrel with this description of the Office of the Chief of Chaplains or the Conference of Ecclesiastical Endorsing Agents. They do, however, reject plaintiffs' conclusion that an excessive entanglement between church and state is thereby created. To summarize, defendants note that the liaison function is "an informational function ... that most public agencies perform," and that, although the relationship between the Army and endorsing agencies does continue after a Chaplain has entered the Army, the Army's interest is limited to insuring that the Chaplains retain their endorsement. The Office of the Chief of Chaplains, defendants maintain, does not involve itself with the internal affairs of these agencies. Defendants' Memorandum of Law For Summary Judgment at 61–62.

One other area merits exposition: the voluntary religious instruction programs conducted as part of the Chaplaincy Program. Army Regulation 165–20, ¶ 2–1, which sets forth the duties of Army Chaplains, establishes the following educational program:

b. Religious education. The education program will be centered around many religious needs and interests. Generally, the program includes the following:

(1) Religious schools and classes.

(2) Individual instruction.

(3) Classes in marriage and family life enrichment.

(4) Religious and cultural interest groups.

(5) Choral groups.

(6) Leadership development programs.

(7) Religious dance, drama, and films.

(8) Youth and adult programs and activities.

By the defendants' own admission,

[t]he Executive Director of the Department of Defense Armed Forces Chaplains Board selects an approved curricula [sic] for Armed Forces religious education programs: Catholic, Jewish, and Protestant. Def. Adm. No. 78.

These curricula are contained in "the Cooperative Curriculum for Religious Education," and the program is directed primarily at children. Most of the classes for children are taught by civilian volunteers, not by Army Chaplains. Defendants note that use of the curriculum is voluntary and that it provides a measure of continuity for families transferred from one base to another. Defendants' Memorandum of Law for Summary Judgment at 12–13.

The parties substantially agree with the Court's description of the operation of the Program. Similarly, there are few disagreements as to the structural relationship between the various ecclesiastical bodies and the Army hierarchy. The parties differ markedly, however, in their evaluation of that relationship.

Plaintiffs see a program that spins a tightly-woven net binding the Army to religious institutions. Defendants perceive only a loose confederation between the Army and religious organizations that is no more than necessary to serve the dual goals of military efficiency and religious freedom. While plaintiffs focus on the establishment clause, defendants emphasize the free exercise clause of the First Amendment and maintain that the free exercise needs of military personnel should not be risked on an untried civilian chaplaincy, particularly since the current program functions so well.

## DISCUSSION

### I. *Law of the Case*

As a preliminary matter, I address plaintiffs' argument that Judge Mishler's prior opinion disposes of the standing issue. Plaintiffs argue, in substance, that because Judge Mishler has already determined that they have standing, I should refrain from reconsidering the issue.

■ As a general rule, "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944, 953 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). As defendants correctly note, however, the doctrine of law of the case does not state an "inviolate rule." *United States v. Birney*, 686 F.2d 102, 107 (2d Cir.1982), but is best viewed as an aspect of judicial economy and discretion. *See id.* Thus perceived, the doctrine is not profitably applied in this case.

■ Defendants contend that the Supreme Court decision in *Valley Forge, supra*, 454 U.S. at 464, 102 S.Ct. at 752, 70 L.Ed.2d at 700, which was decided after Judge Mishler's decision, changes the result of the standing issue. Plaintiffs concede that "[i]f it were actually the case that [*Valley Forge*] eliminated taxpayer standing ..., we would agree that reexamination of Judge Mishler's opinion would be appropriate." Plaintiffs' Memorandum of Law in Opposition to Defendants' Renewed Motion to Dismiss for Lack of Standing at 3–4. The logic of both parties, running on parallel lines, leads to the same ineluctable result: I must re-examine the question of standing in light of the *Valley Forge* decision. The doctrine of the law of the case is no obstacle.

### II. *Standing*

If plaintiffs have any standing to bring this suit, it can only be by virtue of their status as taxpayers. The analysis, therefore, must begin with *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

In *Flast*, federal taxpayers sought to declare that the expenditure of federal funds under the Elementary and Secondary Education Act of 1965 constituted a violation of the First Amendment. Recognizing that the 1923 decision in *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) "[had] stood for 45 years as an impenetrable barrier to suits ... brought by individuals who [could] assert only the interest of federal taxpayers," *Flast, supra*, 392 U.S. at 85, 88 S.Ct. at 1944, the Supreme Court decided, nonetheless, that a fresh examination of the taxpayer standing issue was due.

The *Flast* Court began by noting that the notion of standing is but one strand in the rope that constitutes the broader concept of justiciability. Standing focuses on the plaintiff to ascertain whether "the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon

which the court ... depends for illumination of difficult constitutional questions.'" *Id.* at 99, 88 S.Ct. at 1952 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). As subsequent Supreme Court decisions have made clear, the federal judiciary is an inappropriate forum "for the ventilation of public grievances or the refinement of jurisprudential understanding." *Valley Forge, supra,* 454 U.S. at 473, 102 S.Ct. at 759.

The *Flast* Court then fashioned a two-pronged test to determine whether the necessary "personal stake" in the outcome has been established. First, the party must establish a "logical link" between his taxpayer status and the type of legislation he challenges. Hence, a taxpayer is a proper party to challenge only "exercises of congressional power under the taxing and spending clause of Art. I, § 8. ... It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute." *Flast v. Cohen, supra,* 392 U.S. at 102, 88 S.Ct. at 1954.

Second, the taxpayer must demonstrate a "nexus" between his status *qua* taxpayer "and the precise nature of the constitutional infringement alleged.... [He] must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." *Id.* at 102–03, 88 S.Ct. at 1954.

The Court fleshed out the nexus skeleton by holding that plaintiff's challenge to the exercise of the taxing and spending power under Article I, § 8, satisfied the first prong, and that the Establishment Clause of the First Amendment, viewed historically, operated as a specific limitation on Congress' ability to tax and spend. Thus, because the claims were specifically rooted in

the Establishment Clause, the second prong was also satisfied.

Application of the two-step test announced in *Flast* creates a high risk of debasing the concept of taxpayer standing into a constitutional word-game.[2] Fortunately, however, we are not without guidance. The *Flast* Court itself summarized the standing test:

> Consequently, we hold that a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power."

*Flast v. Cohen, supra,* 392 U.S. at 105–06, 88 S.Ct. at 1955. Thus viewed, the difficult task of finding a "logical link" and a "nexus" is reduced to a more straightforward proposition: The challenged action must be: (1) congressional in nature; (2) an exercise of Congress' taxing and spending power; and (3) an alleged violation of a specific constitutional provision limiting the exercise of that power. *Flast v. Cohen, supra;* *see Valley Forge, supra,* 454 U.S. at 478–79, 102 S.Ct. at 761–62.

Two post-*Flast* cases, in which standing was denied, shed additional light. In *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), plaintiff sued the Government to compel the Executive Branch to reveal certain expenditures by the C.I.A. The Court held that plaintiff lacked taxpayer standing because he alleged a violation of the Statement and Account Clause, Art. I, § 9, cl. 7, 50 U.S.C. § 403a *et seq.,* rather than a transgression of the taxing and spending powers of Congress. *Id.* at 174–75, 94 S.Ct. at 2945–46. Likewise, in *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), plaintiff failed to establish standing because his challenge to a Pentagon policy allowing members of Congress to retain their status

---

**2.** The holding in *Flast* has been the subject of much critical commentary. *E.g.,* Bittker, *The Case of the Fictitious Taxpayer; The Federal Taxpayer's Suit Twenty Years After* Flast v. Co-

hen, 36 U.Chi.L.Rev. 364 (1969); Davis, *Standing: Taxpapers and Others,* 35 U.Chi.L.Rev. 601 (1968); Scott, *Standing in the Supreme Court—A Functional Analysis,* 86 Harv.L.Rev. 645 (1973).

in the Armed Forces Reserve concerned the Incompatibility Clause, not the Taxing and Spending Clause. *Id.* at 228, 94 S.Ct. at 2935.

*Richardson* and *Schlesinger* instruct us that taxpayer standing thrives in narrow confines. Nevertheless, they are of limited assistance here, because the statutes challenged in those cases plainly did not involve Congress' taxing and spending power.

A much closer question was presented in *Valley Forge*, where plaintiffs challenged the conveyance of some land to the Valley Forge Christian College, a religious institution. The transfer was effected pursuant to three distinct links in the following chain of authority: (a) the Property Clause of the United States Constitution, Art. IV, § 3, cl. 2, vests Congress with the "[p]ower to dispose of and make all needful Rules and Regulations respecting the ... Property belonging to the United States." Pursuant to this constitutional authority, (b) Congress enacted the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471 *et seq.* The relevant section of the statute is section 484, which provides that "property that has outlived its usefulness to the Federal Government is declared 'surplus' and may be transferred to private or other public entities." *Valley Forge, supra,* 454 U.S. at 466–67, 102 S.Ct. at 755 (footnote omitted). Subsection (k)(1) of Section 484 authorizes the Secretary of Education to dispose of such surplus property "for school, classroom, or other educational use," and subparagraphs (A) and (C) of that subsection empower the Secretary to take into account any actual or potential benefit to the United States from the sale or lease of property to non-profit, tax exempt institutions. The latter has been further defined by the third link in this chain, 34 C.F.R. § 12.9(a) (1980), which provides for the computation of a "public benefit allowance," discounting the transfer price of the property "on the basis of benefits to the United States from the use of such property for educational purposes."

The land in *Valley Forge* was appraised at $577,500 when it was conveyed. The Secretary, however, granted a 100% public benefit allowance, thereby permitting Valley Forge Christian College to acquire the property without actually paying anything. Plaintiffs attacked the transfer, asserting that they "would be deprived of the fair and constitutional use of [their] tax dollar ... in violation of [their] rights under the First Amendment of the United States Constitution." *Id.* at 469, 102 S.Ct. at 757.

The District Court dismissed the complaint for lack of standing, but the Third Circuit reversed. The Circuit Court conceded that, because taxpayer standing required the challenged enactment to · be an exercise of Congressional power under the Taxing and Spending Clause of Art. I, § 8, plaintiffs had not satisfied the requirements of *Flast* (the conveyance had been authorized by legislation enacted under the Property Clause).

Blazing a new trail, the Circuit Court, nonetheless, found that plaintiffs had standing, and molded a new concept of standing: Citizens, claiming " 'injury in fact' to their shared individuated right to a government that 'shall make no law respecting the establishment of religion,' " *Americans United for Separation of Church and State, Inc. v. United States Dep't of H.E.W.,* 619 F.2d ·252, 261 (3d Cir.1980), *rev'd sub nom. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), could now bring suit.

It was this "unusually broad and novel view of standing," *Valley Forge, supra,* 454 U.S. at 470, 102 S.Ct. at 757, that prompted the Supreme Court to grant *certiorari.* Reversing, the Court reaffirmed *Flast.* Discussing at length its holdings in *Richardson* and *Schlesinger,* the Court regarded these cases as removing "[a]ny doubt that once might have existed concerning the rigor with which the *Flast* exception to the *Frothingham* principle ought to be applied." *Id.* at 481, 102 S.Ct. at 763.

Plaintiffs in *Valley Forge* failed to satisfy the *Flast* requirements in several re-

spects. First, their challenge was not to a congressional action directly, but to a decision by an agency—H.E.W.—to transfer federal property. Second, and, as the Court recognized, "perhaps redundantly," the property transfer complained of was an exercise of Congress' power under the Property Clause, Art. IV, § 3, cl. 2, rather than under the Taxing and Spending Clause of Art. I, § 8. *Id.* at 480, 102 S.Ct. at 762.

■ Two conclusions emerge from the *Flast, Richardson, Schlesinger* and *Valley Forge* cases. To earn standing the plaintiffs must launch their attack against an action by *Congress* (as distinct from bureaucratic implementation of congressional directives); and that attack must rest squarely upon a specific constitutional limitation on Congress' power under the *Taxing and Spending* Clause of Article I.

Defendants vigorously deny that either condition has been fulfilled in this case; and they rest foursquare upon *Valley Forge* for their argument. I find *Valley Forge* inapposite, however, and I conclude that plaintiffs have standing.

1. *The Congressional Action Requirement*

In *Flast,* Congressional funds were spent by New York State on religious materials and instruction. These funds were originally provided by Congress under Title I of the Elementary and Secondary Education Act of 1965. By the terms of 20 U.S.C. § 241f (1976), Congress had broad power to oversee expenditures by the states. Congressional action was clearly in issue.

In *Valley Forge,* the asserted governmental impropriety was the decision by H.E.W. to grant surplus land to a religious organization. Respondents failed "the test for taxpayer standing ... [because] the source of their complaint [was] not a congressional action, but a decision by HEW to transfer a parcel of federal property." *Valley Forge, supra,* 454 U.S. at 479, 102 S.Ct. at 762 (footnote omitted).

■ The challenge here is to that portion of the overall congressional appropriation for the Army that is used for the operation and maintenance of the Chaplaincy Program. This eighty-five million dollar expense is included in the Army's annual budget, and can no more be characterized as "an incidental expenditure of tax funds in the administration of an essentially regulatory statute," *Flast v. Cohen, supra,* 392 U.S. at 102, 88 S.Ct. at 1954, than could the appropriations that were the subject of the *Flast* suit. Whatever additional powers Congress may have exercised in passing the Army's budget, which includes funds for the Program, it clearly exercised its Constitutional authority to spend.

Defendants argue that the funds for the Chaplaincy Program are only a small part of the entire Army allocation. This might be a relevant consideration, but only if Congress were unaware of the use to which the funds were being put. If, for example, Congress budgeted funds for one purpose, and a bureaucrat spent them for another and unconstitutional purpose, Congress could not be deemed to have authorized the ultimate expenditure. In such a case, the taxpayer would be challenging unconstitutional action by the Executive Branch, not a Congressional transgression in the exercise of its spending powers. *Cf. Public Citizens, Inc. v. Simon,* 539 F.2d 211 (D.C.Cir.1976) (plaintiff lacked taxpayer standing to challenge use of White House staff for campaign purposes in violation of Appropriations Clause).

Congress, however, knows all about the Chaplaincy Program and scrutinizes its funding regularly. "Congress has repeatedly considered, and reaffirmed, the need for an Army Chaplaincy, and has frequently exercised its oversight authority to insure that general appropriations have not been spent unnecessarily ...." Defendants' Reply Memorandum at 8. Thus, despite the wide latitude the Army is given in the expenditure of tax dollars, it is Congress that consistently decides whether the Chaplaincy Program merits funding. *See infra* pt. III, A, 3.

### 2. The Taxing and Spending Clause Requirement

Defendants make an attractive argument that the constitutional source of the Congress' power over the Chaplaincy Program traces, not to the Taxing and Spending Clause, but to the War Powers Clause of Art. I, § 8. They rely principally upon *Velvel v. Nixon*, 415 F.2d 236 (10th Cir. 1969), *cert. denied*, 396 U.S. 1042, 90 S.Ct. 684, 24 L.Ed.2d 686 (1970), where the Court held that Congressional expenditures for the Viet Nam War were authorized by the War Powers Clause, not by the Taxing and Spending Clause. I reject this argument.

Because there is no litmus test to determine which power Congress exercises in enacting a given statute, some writers have suggested that it is wiser to regard "all government spending [as] an exercise of the congressional power to tax and spend." Davis, *Standing: Taxpayers and Others*, 35 U.Chi.L.Rev. 601, 605 (1968). This view finds some support in *Flast*, where the Court repeatedly emphasized that taxpayer standing was designed to allow federal taxpayers to challenge "a specific expenditure of federal funds." *Flast v. Cohen, supra*, 392 U.S. at 114, 88 S.Ct. at 1960 (Stewart, J., concurring). In limiting the scope of taxpayer standing, the Court's concern was to block challenges to "essentially regulatory statute[s]." *Id.* at 102, 88 S.Ct. at 1954. It may be fairly inferred that the *fact* of Congressional spending—rather than the nominal source of that spending—was the Court's central concern.

It cannot be gainsaid that the Chaplaincy Program, like the challenged statute in *Flast*, involves congressional spending. Absent a clear sign from the Supreme Court to the contrary, I am persuaded that, in such a case, a federal court should not attempt to divine whether a particular statute authorizing spending is enacted under the Taxing and Spending Clause, or under some other, arguably appropriate, source of Congressional power.

It is also noteworthy that the Taxing and Spending Clause itself expressly states that one of the purposes of taxing and spending is to "provide for the common defence." Art. I, § 8, cl. 1. In their affidavits and memoranda, Army personnel and defendants argue that the Chaplaincy is necessary for the efficient functioning of the Army. It would therefore be disingenuous, at best, to conclude that Congress was not acting under the Taxing and Spending Clause when it provided funding for the Chaplaincy.

### 3. Constitutional Limitations on the Taxing and Spending Power

*Flast* requires that for a taxpayer to have standing, the challenged action must be grounded in a congressional breach of "a specific limitation upon its taxing and spending power." *Flast v. Cohen, supra*, 392 U.S. at 105, 88 S.Ct. at 1955. One such limitation is the Establishment Clause: "We have noted that the Establishment Clause of the First Amendment does specifically limit the taxing and spending power conferred by Art. I, § 8." *Id.* Plaintiffs, having alleged this specific violation, clearly satisfy this requirement for taxpayer standing.

Accordingly, for the reasons discussed above, I conclude that plaintiffs have standing, as taxpayers, to challenge the constitutionality of the Chaplaincy Program.

## III. The Merits

### A. Scope of Judicial Inquiry

■ Although plaintiffs' complaint does not entangle the Court in a "political question," as that term is used in constitutional law, *see Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), a related issue remains: What should be the extent of judicial review in this case? For the reasons developed below, I conclude that judicial inquiry into the constitutionality of the Army Chaplaincy Program must be attended by a greater deference to congressional action than is typically required.

### 1. Challenges to Military Programs

That the Chaplaincy Program exists in a military setting compels a court to accord

congressional and executive determinations great deference. Just three years ago the Supreme Court cautioned district courts about interfering in matters military. When Congress acts with respect to the military, judicial deference "is at its apogee." *Rostker v. Goldberg*, 453 U.S. 57, 70, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981). The Court further noted: "Not only is the scope of Congress' constitutional power in this area broad, but the lack of competence on the part of the courts is marked." *Id.* at 65, 101 S.Ct. at 2652 (citation omitted).

Plaintiff in *Rostker* attacked the Military Selective Service Act because it required men, but not women, to register for the draft. Wading into the rationale for this distinction, the District Court reevaluated all the evidence and testimony that had been presented to Congress to justify the distinction. The District Court held the legislation unconstitutional, determining that "military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it." *Goldberg v. Rostker*, 509 F.Supp. 586, 603 (E.D.Pa.1980), *rev'd*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981).

Although the District Court expressly disavowed any intention to encroach upon military territory, the Supreme Court concluded that the opinion "was based on assessments of military need and flexibility in a time of mobilization." *Rostker v. Goldberg, supra*, 453 U.S. at 68, 101 S.Ct. at 2654. For this the District Court was taken to task: "The District Court was quite wrong in undertaking an independent evaluation of this evidence, rather than adopting an appropriately deferential examination of *Congress'* evaluation of that evidence. *Id.* at 82–83, 101 S.Ct. at 2660–2661 (emphasis in original).

 *Rostker* teaches two lessons. First, while the fact that an issue arises in the military context does not exclude judicial review, the analysis to be applied may differ. *Id.* at 67, 101 S.Ct. at 2653. Second, courts must not substitute their con-

clusions, based on the same evidence, for those of Congress. "Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

### 2. *Historical Support for the Chaplaincy Program*

It is not without significance that the First Congress drafted the First Amendment and, at the same time, authorized a paid Chaplain for the Army. As the Supreme Court has observed: "[T]he enactment of [a] statute by the same Congress that promulgated the constitutional amendments that ultimately became the Bill of Rights gives [that] statute an impressive historical pedigree." *United States v. Villamonte-Marquez*, —— U.S. ——, 103 S.Ct. 2573, 2578, 77 L.Ed.2d 22 (1983) (citing *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d (1977)). It indicates, if nothing else, that our founding fathers saw no inconsistency between the two.

The argument from history recently gained judicial respect in *Marsh v. Chambers*, —— U.S. ——, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), where a member of the Nebraska State Legislature brought suit to declare that the Legislature's practice of opening each session with a prayer violated the Establishment Clause (as applied to the states through the Due Process Clause of the Fourteenth Amendment). Upholding the constitutionality of the program, the Court placed great emphasis on the fact that the First Congress, which drafted the First Amendment, also opened each legislative session with a prayer, and that the practice has continued, without interruption, to this day. *Id.* at 3333–34.

*Chambers* might suggest that because the Chaplaincy was authorized by the First Congress, it is therefore constitutional. Such a mechanistic reading would reduce constitutional adjudication to a simple historical exercise. As Justice Brennan noted in his *Chambers* dissent, the mere fact that

a particular program or statute was enacted by the First Congress does not make it constitutional for all time. A majority of the Court had already recognized this principle in a somewhat different context: "The fact that a procedure would pass muster under a feudal regime does not mean it gives necessary protection ... in its modern forms." *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969).

Whereas the chaplaincy authorized by the First Congress consisted of only one chaplain, and thus might be comparable to the practice upheld in *Chambers*, Congress in 1982 appropriated to the Army more than $85 million for religious programs. Defendants' Response to Plaintiffs' Second Set of Interrogatories No. 1. The exponential growth of the program underscores the fallacy of relying conclusively upon the actions of the First Congress, when the practice challenged bears little resemblance to that instituted, and thus approved, by the Founding Fathers.

### 3. *Continued Congressional Consideration of the Chaplaincy Program*

The history of the Chaplaincy Program is checkered by periodic congressional consideration of the Program's constitutionality and advisability. As early as the 1840's and 1850's, for example, citizens of several states, in "memorials" to Congress, criticized the paid Chaplaincy Program. After considering the arguments advanced by these "memorialists," Congress expressly reaffirmed the program. H.R.Rep. No. 124, 33rd Cong., 1st Sess. (1854). During World War I, Congress broadened the Program by appointing Chaplains of faiths not then represented in the Army. Act of May 25, 1918, 40 Stat. 561. Ever since its inception, Congress has overseen the maintenance and growth of the Chaplaincy.

Given this impressive historicity, defendants conclude that the Program, consistently considered constitutional by Congress, must therefore be upheld by this Court. Defendants fail to appreciate, however, that "no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence." *Walz v. Tax Commission*, 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970). They also overlook that, notwithstanding the deference to be paid to congressional action respecting the military, the task of constitutional adjudication has been delegated to the Courts, not the Congress. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–178, 2 L.Ed. 60 (1803).

### B. *Establishment Clause Analysis of the Chaplaincy Program*

The question presented is straightforward: Whether Congress, acting under its explicit constitutional authority to raise and support armies, has in carrying out that authority transgressed the equally explicit guarantee of individual rights contained in the Establishment Clause. *Cf. Rostker v. Goldberg, supra*, 453 U.S. at 70, 101 S.Ct. at 2654. Plaintiffs' principal answer is equally direct: The Chaplaincy, as implemented, violates each part of the traditional three-part test for determining constitutional compliance with the Establishment Clause.

Traditionally, whenever a statute is claimed to violate the Establishment Clause, a three-part test is applied: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (citations omitted). Perhaps the most notable feature of *Marsh v. Chambers*, however, was the Court's refusal to apply this orthodox analysis to the Nebraska Legislature's practice of opening each session with a prayer.

In *Chambers*, because of the narrow question presented, the historic nature of the practice involved, and the fact that the forum provided to the chaplain was not exploited as a means of proselytizing, the

Court concluded that upholding the practice posed "no real threat" to the sanctity of the Establishment Clause. *Marsh v. Chambers, supra,* 103 S.Ct. at 3337. As Justice Goldberg had earlier noted, "[i]t is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." *School District of Abington Township v. Schempp,* 374 U.S. 203, 308, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring). Accordingly, if *Chambers* teaches us anything, it is that unique programs and practices may not be the proper subjects for traditional analysis.

Prior decisions evaluating Congress' actions vis-a-vis the military have recognized that military matters are *sui generis. E.g., Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976); *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Indeed, the Court has, on at least two occasions, expressly stated that standard analyses are inappropriate in the military context.

In *Parker v. Levy, supra,* the Court noted that "the different character of the military community and of the military mission requires a different application of [First Amendment] protections." 417 U.S. at 758, 94 S.Ct. at 2563. More recently, in *Rostker v. Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), the Court recognized that although Congress is obviously subject to Due Process limitations when it acts on military affairs, "the tests and limitations to be applied may differ because of the military context." *Id.* at 67, 101 S.Ct. at 2653.

■ In light of the Supreme Court's approach to the Legislative prayer problem in *Marsh v. Chambers,* this Court is per-suaded that the most appropriate test of the constitutionality of the Chaplaincy Program is whether the Program is "a real threat to the Establishment Clause." *Marsh v. Chambers, supra,* 103 S.Ct. at 3335.

Defendants offer three justifications for the Chaplaincy: (1) The Chaplaincy is necessary for the maintenance of good morale; (2) the Free Exercise Clause of the First Amendment requires the government to provide means of worship for Army personnel; and (3) military considerations render unfeasible a system of voluntary accommodation of religious beliefs, and require the Army to actively support religious institutions. Thus, the keystone of the defense is the argument that the uniqueness of the military requires the Program if the Government is to secure the rights of military personnel to exercise freely their religious preferences.

Defendants cite a number of factors which, they contend, render the Chaplaincy essential. First, "[b]ecause Army installations ... are generally situated in areas which are removed from well populated areas, ... there ordinarily are few civilian churches, if any, near installations.... The few churches there are could hardly accommodate the sheer number of soldiers, not to mention their specific denominational preferences." Defendants' Brief of May 19, 1982, at 9. Second, cultural and linguistic barriers pose additional obstacles to soldiers stationed abroad. *Id.* at 9–10. Third, soldiers "must be prepared to be deployed immediately anywhere in the world." *Id.* at 10. Therefore, "only a chaplain who is deployed with the troops would be definitely available to minister to the soldiers." *Id.* Finally, defendants point to the testimony of several Army generals to support the proposition that, during war, there has been a shortage of civilian clergy available to minister to the troops. *Id.*

Plaintiffs counter with several arguments: (1) defendants place undue emphasis on the rare scenario of the lonely soldier stationed in a remote outpost; (2) assuming that a Chaplaincy is required, the current

program both fails to secure the very Free Exercise rights it seeks to protect, and contains features unrelated to that First Amendment goal; and (3) a voluntary chaplaincy would pass constitutional muster, and would satisfy the Free Exercise needs of Army personnel.

Plaintiffs themselves have answered their first argument. Defending a civilian chaplaincy, they state that such a program could provide a ministry of equal comprehensiveness as that currently in effect, and would reach even those soldiers stationed at lonely outposts. Plaintiffs, therefore, tacitly concede that all soldiers, no matter where deployed, must be granted the opportunity to worship.

Plaintiffs' second argument is subsumed by the third; together they are the linchpin of plaintiff's case: A voluntary chaplaincy would accommodate the Free Exercise needs of Army personnel, without breaching the wall of separation between church and state mandated by the Establishment Clause.

In support of the claim that a voluntary chaplaincy would suffice, plaintiffs rely exclusively on the example of the Wisconsin Synod of the Lutheran Church (the "Wisconsin Synod"). That denomination provides volunteer chaplains to minister to its adherents, and has existed alongside the government-funded chaplaincy for the past forty years. Plaintiffs' Brief of Oct. 4, 1982 at 4. The President and Spiritual Leader of the Wisconsin Synod, Carl H. Mischke, has described that denomination's chaplaincy as follows:

> The Wisconsin Synod conducts its civilian chaplaincy program entirely at its own expense and as its own responsibility, neither expecting the government to finance its effort nor to prescribe its method and aims .... The Wisconsin Synod's civilian chaplaincy program has allowed us to adequately provide religious support to our members in peace and war, at home and overseas.

Affidavit of Rev. Mischke ¶¶ 11, 12 (hereinafter cited as "Mischke Affidavit").

Rev. Mischke concludes that the chaplains of the Wisconsin Synod have been able to serve adherents effectively, even in time of war. To support this conclusion, Rev. Mischke offers several observations. First, he notes that "numerous pastors of the Wisconsin Synod served as civilian chaplains in Vietnam, during this country's military involvement there. These civilian chaplains performed their ministry at military installations and front-line areas wherever the need arose." *Id.* ¶ 13. Second, it is claimed that "Wisconsin Synod civilian chaplains ... in Europe conduct religious services and supervise religious education programming wherever our members are stationed." *Id.* ¶ 14. Further, those chaplains "conduct an extensive religious program for our members ... who are stationed in the United States. Here, as well, our programs encompass pastoral care, religious services, religious retreats, lay leadership programs, and the distribution of Scriptural and religious literature—all at our own expense." *Id.* ¶ 15.

Plaintiffs characterize the government's role in such a scheme as one of "a neutral provider of opportunity." Plaintiffs' Brief of October 4, 1982 at 6. In such a role, the Army has provided "logistic support to [Wisconsin Synod] civilian chaplains in accordance with its regulations governing nongovernmental, nonmilitary agencies and individuals in overseas military commands." Mischke Affidavit ¶ 16.

Not surprisingly, the Army disputes plaintiffs' conclusion that the voluntary chaplaincy administered by the Wisconsin Synod is adequate to meet the First Amendment needs of military personnel. Defendants point out that, according to Rev. Mischke's own declaration, "there are presently only two Wisconsin Synod ministers located abroad who minister their ... members in both the Army and Air Force stationed in Europe." Defendants' Brief of October 21, 1982 at 16. Thus, the Wisconsin Synod chaplains are perceived by defendants as inadequate to minister to European troops. Each is responsible for covering a large geographical area and not able to provide any religious support to Ameri-

can soldiers and their families stationed in Scandinavian countries, Greece or Turkey. Nor do these civilian chaplains accompany Wisconsin Synod soldiers on the numerous and extended field training exercises in which most soldiers must participate. Declaration of Chaplain (Col.) Whitfield M. McMillan ¶¶ 6–7.

Defendants also counter with the declaration of Dr. Gerhardt W. Hyatt, former Chief of Chaplains and current Vice-President of the Lutheran Church Missouri Synod. He states that the support provided by the Wisconsin Synod has been insufficient to satisfy the needs of its adherents. "For example," defendants state, "based on his experience as Command Chaplain in Vietnam from September 1968 through October 1969, Dr. Hyatt observed that the extent of religious support provided by the Wisconsin Synod in Vietnam during that period consisted of one civilian chaplain . . . who ministered to soldiers only in the . . . 'rear areas,' and not in the front lines as claimed by Reverend Mischke." Defendants' Brief of October 21, 1982 at 17 (citing Declaration of Dr. Hyatt ¶ 9).

In *Rostker*, the Supreme Court reviewed at length the numerous cases in which it has deferred to Congress' judgment in military matters. *Rostker v. Goldberg, supra,* 453 U.S. at 64–72, 101 S.Ct. at 2651–2655. *E.g., Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976); *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). These decisions lead inexorably to one conclusion: Judicial involvement in disputes such as the one presented here concerning the feasibility of alternatives to the existing Chaplaincy Program is the chief evil against which the doctrine of judicial deference is directed.

Resolution of this factual dispute would require the same far-reaching, independent evaluation of Congress' judgment as that in which the District Court in *Rostker* erroneously engaged. Congress and the courts have recognized that the military is unique. *Parker v. Levy, supra,* 417 U.S. at 743–44, 94 S.Ct. at 2555–56; *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953). Whether voluntarily or by conscription, those who join the military become members of a separate society, in which the laws and customs by which their countrymen live are supplanted by comprehensive military regulations. *See Orloff v. Willoughby, supra,* 345 U.S. at 94, 73 S.Ct. at 540.

Pursuant to its Constitutional authority to raise and support armies, Congress has the power to "make all laws necessary and proper to that end." *United States v. O'Brien, supra,* 391 U.S. at 377, 88 S.Ct. at 1679. In exercising that power, Congress has provided for chaplains in an effort to allow all soldiers to worship however they choose, if they choose to do so at all. Given the obligations and restrictions imposed upon those in the military, Congress may constitutionally do no less. The Supreme Court recognized this in *School District of Abington Township v. Schempp, supra,* when it stated in dictum that, in the military "the Government regulates the temporal and geographic environment of individuals to a point that, unless it permits voluntary religious services to be conducted with the use of government facilities, military personnel would be unable to engage in the practice of their faiths." 374 U.S. at 226 n. 10, 83 S.Ct. at 1573 n. 10.

Affording an opportunity for worship without coercion preserves the religious neutrality of the Government. As the Court recognized in *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them." *Id.* at 18, 67 S.Ct. at 513.

Whether the Free Exercise rights of soldiers may be secured by an alternative civilian chaplaincy is a question I am both unequipped and unempowered to answer. *See Rostker v. Goldberg, supra.* I note, however, that it is at least arguable that such a chaplaincy would present insuperable logistical problems. Examples abound: difficulty in scheduling; lack of control over civilian personnel on military installations; and lack of rapid mobility suggest themselves. The balance struck by Congress cannot be rejected by this Court in favor of the untested possibility that a civilian chaplaincy might also meet the religious needs of the military community.

In its present form, then, the Army Chaplaincy Program is a constitutionally permissible means to a constitutionally mandated end. Plaintiff's remedy, if there be any, lies with Congress. For all of the foregoing reasons, plaintiffs' motion for summary judgment is denied, defendants' motion is granted, and the complaint is dismissed.

SO ORDERED.

### ON MOTION TO AMEND

On February 1, 1984 this Court issued a Memorandum and Order granting summary judgment to defendants and dismissing plaintiff's complaint. Plaintiffs now move pursuant to Fed.R.Civ.P. 59(e) for an Order amending the judgment to grant partial summary judgment in their favor. While the motion was made prior to entry of the judgment, and is thus not strictly within the framework of Rule 59(e), it nevertheless will be treated as a motion to alter a judgment under that rule. *Smith v. Hudson,* 600 F.2d 60, 62 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

### *Facts*

The ground for plaintiff's motion is that "a newly discovered document undermines the basis upon which this Court ruled." The document in question is a one-page "Issue Paper," prepared by Chaplain (Lieutenant Colonel) James Edgren. No date

appears on the Issue Paper, but apparently it was prepared in late 1982 or early 1983, to provide a discussion topic at an Army Chaplain's conference. *See* Declaration of Chaplain (Major General) Patrick Hessian in Opposition to Plaintiff's Motion (the "Hessian Declaration") ¶ 3, February 24, 1984.

The subject of the Issue Paper is "Contract Clergy." The issue raised therein is to what extent contract (civilian) clergy should be used to supplement or replace military chaplains. Lieutenant Colonel Edgren states that "[i]t is the Chief of Chaplains' policy that the practice of contracting for civilian clergy ... be kept to an absolute minimum." The policy, according to the Issue Paper, is occasioned by this litigation, because excessive use of civilian clergy reinforces "plaintiff's argument that civilians can do the job in place of military chaplains." Issue Paper ¶ 2. The Issue Paper recommends strict adherence to existing guidelines governing the use of civilian clergy, and evaluation of all existing contracts for civilian clergy, on the basis of need, nonavailability of a military chaplain and the value of the services rendered.

Defendants counter with the Hessian Declaration, in which Major General Hessian, Army Chief of Chaplains, refutes Lieutenant Colonel Edgren's assertions as to what constitutes Army policy. In the Hessian Declaration, defendants contend that no new policy has resulted from the instant litigation, but that the "strict limitations on the use of civilian clergy services are a matter of long-standing Army policy," as set forth in Army Regulation 165–20. Hessian Declaration ¶ 4. Additionally, the Issue Paper is one of hundreds routinely prepared for use at conferences. These papers, according to Major General Hessian, "are statements of personal views intended to highlight topics of current interest and to stimulate discussion at conferences. They are not statements of my policy as Chief of Chaplains, nor are they statements of Army policy." *Id.* ¶ 3.

Defendants do not deny that "civilian clergy services through the use of auxiliary

and contract chaplains are effective as limited denominational support to supplement the overall program of religious and spiritual support provided by active duty chaplains." *Id.* ¶ 5. They reject outright, however, the implication that because civilian chaplains are useful in some instances, they can therefore replace the existing military chaplains. *Id.*

In its Memorandum of Order of February 1, 1984, this Court refused to evaluate "[w]hether the Free Exercise rights of soldiers may be secured by an alternative civilian chaplaincy." Memorandum and Order of February 1, 1984 at 37. From this Issue Paper, plaintiffs draw the conclusion that this Court need not make such an evaluation, but should simply grant partial summary judgment to plaintiffs "with respect to those aspects of the Army's religious support program which the Army itself has concluded can be adequately provided by civilians."

*Discussion*

■ Motions to alter or amend a judgment previously entered are addressed to the trial Court's discretion. *Frito-Lay of Puerto Rico, Inc. v. Canas,* 92 F.R.D. 384, 390 (D.P.R.1981). Such a motion may properly be used to seek relief from an order of summary judgment because that is a dispositive determination of law by the trial Court. *Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 811 (9th Cir. 1981).

■ Plaintiffs attempt to construe the Issue Paper as an admission by defendants that requires partial summary judgment in plaintiffs' favor. That attempt falls woefully short of its mark. Nowhere in the Issue Paper is the question of funding discussed. That, of course, has been the crux of plaintiffs' argument throughout this litigation: that government expenditures to provide military services to soldiers violate the Establishment Clause. There is no admission by defendants that clergy paid from sources other than the government may replace the existing military chaplains while securing the Free Exercise rights of

soldiers. Indeed the very phrase used in the Issue Paper—"civilian clergy under contract to the Army"—implies that taxpayer money will be used to support civilian clergy. That constitutional question has previously been answered in this litigation.

To the extent plaintiffs attempt to raise an issue of fact whether and to what extent civilian chaplains may be used in lieu of military chaplains, the motion is denied, for the reasons stated in the Memorandum and Order of February 1, 1984: It "is a question [this Court] is both unequipped and unempowered to answer. *See Rostker v. Goldberg,* [453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) ]."

Plaintiffs request in the alternative that, if the motion for summary judgment is denied, they be allowed further limited discovery pursuant to Fed.R.Civ.P. 56(d). Further discovery in this case, no matter how "limited," would be pointless. Plaintiffs are merely attempting to resurrect an issue this Court has laid to rest.

For all of the foregoing reasons, plaintiffs' motion pursuant to Fed.R.Civ.P. 59(e) is denied. Similarly, plaintiffs' request pursuant to Fed.R.Civ.P. 56(d) is also denied.

SO ORDERED.