**Joel KATCOFF and Allen M. Wieder, Plaintiffs-Appellants,**

v.

**John O. MARSH, Jr., Secretary of the Army, the Department of the Army, and the Department of Defense, Defendants-Appellees.**

**No. 352, Docket 84–6184.**

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1984.

Decided Jan. 22, 1985.

Meskill, Circuit Judge, filed concurring and dissenting opinion.

---

Joel Katcoff, New York City, pro se (Allen M. Wieder, New York City, on brief).

Miles M. Tepper, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Patrick B. Northup, Asst. U.S. Atty., Brooklyn, N.Y., Lt. Col. Michael J. Nardotti, Jr., Maj. Thomas R. Folk, Dept. of the Army, Washington, D.C., of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, and MANSFIELD and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge.

This appeal raises the question of whether Congress and the United States Army ("Army"), in furnishing chaplains as part of our armed forces to enable soldiers to practice the religions of their choice, violate the Constitution. We hold that, except in a few respects that require further consideration, they do not.

Appellants, two practicing attorneys who were Harvard Law School students when they commenced the action, appeal from an

order of the Eastern District of New York, Joseph M. McLaughlin, Judge, granting summary judgment dismissing their complaint, which seeks declaratory and injunctive relief against continuation of the Army's chaplaincy program as violative of the Establishment Clause. We affirm except to the extent that the order applies to a few specific aspects of the program, which we reverse and remand for further proceedings.

Congress, in the exercise of its powers under Art. I, § 8, of the Constitution to provide for the conduct of our national defense, has established an Army for the purpose of "preserving the peace and security, and providing for the defense, of the United States," 10 U.S.C. § 3062(a), and has directed that the "organized peace establishment of the Army" consist of all organizations and persons "necessary to form the basis for a complete and immediate mobilization for the national defense in the event of a national emergency," 10 U.S.C. § 3062(d). It has specifically authorized that as part of this establishment there be "Chaplains in the Army," who shall include the Chief of Chaplains, and commissioned and other officers of the Army appointed as chaplains. 10 U.S.C. § 3073. Under 10 U.S.C. § 3547 each chaplain is required, when practicable, to hold religious services for the command to which he is assigned and to perform burial services for soldiers who die while in that command. The statute also obligates the commanding officer to furnish facilities, including transportation, to assist a chaplain in performing his duties. *Id.*

In providing our armed forces with a military chaplaincy Congress has perpetuated a facility that began during Revolutionary days before the adoption of our Constitution, and that has continued ever since then, with the size of the chaplaincy growing larger in proportion to the increase in the size of our Army. When the Continental Army was formed those chaplains attached to the militia of the 13 colonies became part of our country's first national army. P. Thompson, 1 *The United States Army Chaplaincy* xix (1978).

On July 29, 1775, the Continental Congress authorized that a Continental Army chaplain be paid, II Cont.Cong.Jour. 220 (1775), and within a year General George Washington directed that regimental Continental Army chaplains be procured. V *The Writings of George Washington From The Original Manuscript Sources* 244–45 (J. Fitzgerald ed. 1932).

Upon the adoption of the Constitution and before the December 1791 ratification of the First Amendment Congress authorized the appointment of a commissioned Army chaplain. Act of March 3, 1791, Ch. XXVIII, § 5, 1 Stat. 222. Since then, as the Army has increased in size the military chaplaincy has been extended and Congress has increased the number of Army chaplains. *See, e.g.*, Act of April 12, 1808, 2 Stat. 481; Act of January 11, 1812, 2 Stat. 671; Act of July 5, 1838, Ch. CLXII, § 18, 5 Stat. 259; Act of February 11, 1847, Ch. VIII, § 7, 9 Stat. 124; Act of February 11, 1847, 9 Stat. 123; Act of July 22, 1861, Ch. IX, § 9, 12 Stat. 270.

In 1981 the Army had approximately 1,427 active-duty commissioned chaplains, 10 auxiliary chaplains, 1,383 chaplain's assistants, and 48 Directors of Religious Education. These chaplains are appointed as commissioned officers with rank and uniform but without command. 10 U.S.C. §§ 3293, 3581. Before an applicant may be appointed to the position of chaplain he must receive endorsement from an ecclesiastical endorsing agency recognized by the Armed Forces Chaplains Board, of which there are 47 in the United States, representing 120 denominations. In addition to meeting the theological standards of the endorsing agency the applicant must also meet minimum educational requirements established by the Department of Defense, which are more stringent than those of some religious denominations having endorsing agencies and are designed to insure the applicant's ability to communicate with soldiers of all ranks and to administer religious programs. In deciding upon the denominations of chaplains to be appointed the Office of the Chief of Chaplains estab-

lishes quotas based on the denominational distribution of the population of the United States as a whole. The entire civilian church population rather than the current military religious population is used in order to assure that in the event of war or total mobilization the denominational breakdown will accurately reflect that of the larger-sized Army.

Upon his appointment the chaplain, except for a number of civilian clerics provided voluntarily or by contract, is subject to the same discipline and training as that given to other officers and soldiers. He is trained in such subjects as Army organization, command relationships, supply, planning, teaching, map-reading, types of warfare, security, battlefield survival, and military administration. When ordered with troops into any area, including a combat zone under fire, he must obey. He must be prepared to meet problems inherent in Army life, including how to handle trauma, death or serious injury of soldiers on the field of battle, marital and family stresses of military personnel, tending the wounded or dying, and psychological treatment of soldiers' drug or alcohol abuse, as well as the alleviation of tensions between soldiers and their commanders. On the other hand, the chaplain is not required to bear arms or receive training in weapons. Under Articles 33 and 35 of the Geneva Conventions Relative to Treatment of Prisoners of War "chaplains" are accorded a non-combatant status, which means that they are not to be considered prisoners of war and they may exercise their ministry among prisoners of war. Promotion of a chaplain within the military ranks is based solely on his military performance and not on his effectiveness as a cleric.

The primary function of the military chaplain is to engage in activities designed to meet the religious needs of a pluralistic military community, including military personnel and their dependents. In view of the Army's huge size (some 788,000 soldiers and 1,300,000 dependents in 1981) and its far-flung distribution (291,000 soldiers stationed abroad and many in remote areas of the United States) the task is an important and formidable one. The Army consists of a wide spectrum of persons of different ethnic, racial and religious backgrounds who go into military service from varied social, economic and educational environments. The great majority of the soldiers in the Army express religious preferences. About 80% are under 30 years of age and a large number are married. As a result it has become necessary to provide religious facilities for soldiers of some 86 different denominations.[1] A sample survey

1. The Army chaplains have been distributed by denominations as follows:

| DENOMINATION | 1980 | 1981 |
|---|---|---|
| Advent Christian | 3 | 3 |
| African Methodist Episcopal | 12 | 12 |
| African Methodist Episcopal Zion | 4 | 4 |
| American Baptist Association | 2 | 3 |
| American Baptist Churches, USA | 54 | 52 |
| American Council of Christian Churches | 1 | 1 |
| Anglican Orthodox | 1 | 1 |
| Assemblies of God | 32 | 34 |
| Associated Gospel | 5 | 5 |
| Association of Evangelical Lutherans | 2 | 2 |
| Association Free Lutheran Church | 1 | 1 |
| Association of Reformed Presbyterian | 2 | 2 |
| Baptist General Conference | 13 | 11 |
| Baptist Missionary | 1 | 1 |
| Brethren Church | 0 | 1 |
| Catholic | 243 | 238 |
| Cedar Mill Bible | 1 | 1 |

| DENOMINATION | 1980 | 1981 |
|---|---|---|
| Christian Churches & Churches of Christ | 12 | 13 |
| Christian Methodist Episcopal | 20 | 19 |
| Christian & Missionary Alliance | 7 | 8 |
| Christian Reformed | 8 | 7 |
| Christian Science | 8 | 9 |
| Church of Christ | 12 | 14 |
| Church of Christ in Christian Union | 1 | 1 |
| Church of God, Indiana | 8 | 8 |
| Church of God, TN | 9 | 9 |
| Church of God in Christ, Inc. | 7 | 8 |
| Church of God of Prophecy | 3 | 3 |
| Churches of God, General Conference | 1 | 1 |
| Congregational Christian (National Association) | 4 | 4 |
| Conservative Baptist Association of America | 15 | 14 |
| Conservative Congregational Christian Conf. | 6 | 6 |
| Disciples of Christ | 48 | 50 |

of military personnel made by the Army in 1979 revealed the following religious preferences among enlisted personnel:

| | |
|---|---|
| Protestant | 38.5% |
| Catholic | 22.5% |
| Mormon | 2.5% |
| Eastern Orthodox | 0.5% |
| Moslem | 1.0% |
| Jewish | 0.7% |
| Buddhist | 0.7% |
| Other religions not listed | 19.3% |
| No religious preference | 14.3% |

Aside from the problems arising out of the sheer size and pluralistic nature of the

| DENOMINATION | 1980 | 1981 |
|---|---|---|
| Eastern Orthodox | 2 | 2 |
| Elim Fellowship | 1 | 1 |
| Evangelical Church in America | 1 | 1 |
| Evangelical Congregational | 4 | 3 |
| Evangelical Free Church | 9 | 9 |
| Evangelical Covenant Church of America | 4 | 4 |
| Evangelical Methodist | 0 | 1 |
| Fellowship of Grace Brethern | 3 | 3 |
| Fire Baptist Holiness | 1 | 1 |
| Four Square Gospel | 2 | 2 |
| Full Gospel Pentecostal | 1 | 1 |
| General Association of General Baptist | 6 | 7 |
| General Association of Regular Baptists | 17 | 17 |
| Grace Gospel Fellowship | 0 | 1 |
| Independent Fundamental Churches of America | 12 | 11 |
| Jewish | 23 | 21 |
| Latter-Day Saints | 18 | 20 |
| Latter-Day Saints (Reorganized) | 1 | 1 |
| Lutheran Church in America | 84 | 85 |
| Lutheran Church-Missouri Synod | 47 | 47 |
| Methodist Free Church | 7 | 8 |
| Missionary Church | 1 | 1 |
| Moravian | 2 | 3 |
| National Association of Free Will Baptists | 4 | 4 |
| National Baptist Convention of America | 6 | 7 |
| National Baptist Convention, USA | 30 | 33 |
| Nazarene | 22 | 23 |
| No. American Baptist Conference | 6 | 5 |
| Open Bible Standard | 2 | 2 |
| Orthodox Church in America | 7 | 8 |
| Orthodox Presbyterian | 2 | 2 |
| Pentecostal Church of God in America | 2 | 2 |
| Pentecostal Holiness | 4 | 5 |
| Plymouth Brethran | 4 | 5 |
| Presbyterian Church in America | 2 | 3 |
| Presbyterian, Cumberland | 11 | 11 |
| Presbyterian, US | 27 | 27 |
| Progressive National Baptist Convention | 3 | 5 |
| Prostestant Episcopal | 39 | 39 |

| DENOMINATION | 1980 | 1981 |
|---|---|---|
| Reformed Church in America | 8 | 7 |
| Reformed Presbyterian Evangelical Synod | 8 | 8 |
| Seventh-Day Adventist | 7 | 7 |
| Southern Baptist | 176 | 162 |
| Unitarian-Universalist Association | 2 | 2 |
| United Church of Christ | 38 | 38 |
| United Methodist | 169 | 163 |
| United Pentecostal, International | 2 | 3 |
| United Presbyterian, USA | 48 | 47 |
| Wesleyan | 6 | 7 |

Army, its members experience increased needs for religion as the result of being uprooted from their home environments, transported often thousands of miles to territories entirely strange to them, and confronted there with new stresses that would not otherwise have been encountered if they had remained at home.[2] In 1981 approximately 37% of the Army's active duty soldiers, amounting to 293,000 persons, were stationed overseas in locations such as Turkey, Sinai, Greece, or Korea. In most of these areas the Judeo-Christian faiths of most American soldiers are hardly

2. In reviewing the district court's summary judgment order we have accepted the facts as set forth by the parties in answers to interrogatories, affidavits, and exhibits (including Army pamphlets, field manuals and other United States Government publications) to the extent that they are not controverted by facts furnished or proferred by the plaintiffs in the form of opposing affidavits.

Although Judge McLaughlin partially granted plaintiffs' motion to strike, as not based on personal knowledge, some statements made in affidavits of various Generals of the Army and other officers in direct command of our armed forces and of the Army's chaplaincy program, which were filed by the defendants in support of their motion, he simultaneously informed the parties that he would accept these affidavits as evidence of the Generals' views "for what they are worth," i.e., as expert opinion. *See* 6 (Pt. 2) J. Moore, *Moore's Federal Practice* ¶ 56.22[1] at 1322–23 (2d ed. 1982); *see also United States v. Johns-Manville Corp.,* 259 F.Supp. 440, 457 (E.D. Pa.1966).

The affiants in question (Generals Edward C. Meyer, Kermit D. Johnson, John W. Vessey, Charles W. Bagnal and Frederick J. Kroesen) appear to be eminently qualified by reason of their extensive experience and training to testify as experts to the matters sworn to by them. Since the plaintiffs have not, with one minor exception (Aff. of Rev. Carl H. Mischke), furnished contrary evidence or represented that such evidence could be obtained and produced

represented at all by local clergy and the average soldier is separated from the local populace by a linguistic and cultural wall. Within the United States the same problem exists in a somewhat different way in that, although the linguistic or cultural barrier may be absent, local civilian clergy in the rural areas where most military camps are centered are inadequate to satisfy the soldiers' religious needs because they are too few in number for the task and are usually of different religious denominations from those of most of the nearby troops.

The problem of meeting the religious needs of Army personnel is compounded by the mobile, deployable nature of our armed forces, who must be ready on extremely short notice to be transported from bases (whether or not in the United States) to distant parts of the world for combat duty in fulfillment of our nation's international defense commitments. Unless there were chaplains ready to move simultaneously with the troops and to tend to their spiritual needs as they face possible death, the soldiers would be left in the lurch, religiously speaking. In the opinion of top generals of the Army and those presently in the chaplaincy, unless chaplains were made available in such circumstances the motivation, morale and willingness of soldiers to face combat would suffer immeasurable harm and our national defense would be weakened accordingly.

Many soldiers in the Army also suffer serious stresses from other causes attributable largely to their military service, which can be alleviated by counseling and spiritual assistance from a leader of their respective faiths. Among these are tensions created by separation from their homes, loneliness when on duty in strange surroundings involving people whose language or customs they do not share, fear of facing combat or new assignments, financial hardships, personality conflicts, and drug, alcohol or family problems. The soldier faced with any of these problems at home would usually be able to consult his spiritual adviser. The Army seeks to furnish the same services through military chaplains. In doing so the Army has proceeded on the premise that having uprooted the soldiers from their natural habitats it owes them a duty to satisfy their Free Exercise rights, especially since the failure to do so would diminish morale, thereby weakening our national defense.

To meet the religious needs of our armed forces Army chaplains and their assistants engage in a wide variety of services to military personnel and their families who wish to use them. No chaplain is authorized to proselytize soldiers or their families. The chaplain's principal duties are to conduct religious services (including periodic worship, baptisms, marriages, funerals and the like), to furnish religious education to soldiers and their families, and to counsel soldiers with respect to a wide variety of personal problems. In addition the chaplain, because of his close relationship with the soldiers in his unit, often serves as a liaison between the soldiers and their commanders, advising the latter of racial unrest, drug or alcohol abuse, and other problems affecting the morale and efficiency of the unit, and helps to find solutions. In some areas the Army also makes available religious retreats, in which soldiers voluntarily withdraw for a short period from the routine activities of daily living to another location for spiritual reflection and renewal.

For this comprehensive religious program involving hundreds of thousands of soldiers and their families, the Army has a large and fairly elaborate administrative organization, including not only the chaplains but also supporting personnel, facilities, publications, and other supplies. The Chief of Chaplains, a major general of the Army, is in general supervision and management of the Army's chaplaincy. His office contains three divisions: (1) Administration and Management, which, among other things, maintains liaison with religious and secular organizations, (2) Plans, Programs and Policies, and (3) Personnel and Ecclesiastical Relations. These divi-

as required by Fed.R.Civ.P. 56(e) and 56(f), the statements in the affidavits furnished by the defendants, whether or not labelled "views" or "expert opinion," appear to us to satisfy the requirements of Rule 56(e).

sions work closely with the Department of Defense Armed Forces Chaplains Board. Over the years the Army has built or acquired more than 500 chapels which are used for the conduct of religious services of many different denominations. In addition it has built more than 100 Religious Educational Facilities, which are used for religious services and classes in religious education for soldiers and members of their families of all ages (including children). The Army has purchased and made available for voluntary use by various denominations numerous chaplain's kits, vocational kits, communion sets and vestments, and religious publications (including Holy Scriptures and Prayer Books for Jewish Personnel, the New Testament of our Lord and Savior Jesus Christ, and a Book of Worship), and has developed a Cooperative Curriculum for Religious Education of the Armed Forces. Professional education and training has also been furnished to Army chaplains.

In view of the huge task faced in providing religion to our armed forces the Army has, in addition to chaplains, employed civilians to assist them in carrying out the program. These include Directors of Religious Education, assistants to chaplains, organists, voluntary religious teachers who participate in its voluntary religious education program, a small number of "auxiliary chaplains" and civilian or "contract clergy" who are employed to perform denominational services for the military community when military and operational requirements permit and chaplains for such denominations or religions are unavailable on the military installation.

The great majority of the chaplaincy's services, facilities, and supplies are procured by the Army through funds appropriated by Congress, which amounted to over $85 million for the fiscal year 1981, of which more than $62 million was used to pay the salaries and other compensation of chaplains, chaplain's assistants and auxiliary chaplains. Much smaller amounts were paid for the services of contract chaplains ($332,000), directors of religious education ($221,000), and organists and choir directors ($412,000). Some $7.7 million of non-appropriated funds, representing voluntary contributions or designated offerings from soldiers and their dependents, were also used in the fiscal year 1981 to provide for the needs of the Army's chaplaincy program. Generally speaking, non-appropriated funds are used for denominational activities such as the purchase of sacred items and literature and the salaries of organists and the choir directors.

Appellants' complaint, filed on November 23, 1979, seeks a declaratory judgment that the foregoing program violates the Establishment Clause and injunctive relief. The complaint alleges that the "constitutional rights of Army personnel and their dependents to freely exercise their religion can better be served by an alternative Chaplaincy program which is privately funded and controlled." (Compl.Par. 33). In the district court and here appellants have not questioned the need to satisfy the Free Exercise rights of military personnel but have claimed that government funding of the chaplaincy program is unnecessary. However, appellants have offered no evidence that the many religious denominations and organizations involved would support or finance such a program other than a July 26, 1982, affidavit of the Rev. Carl H. Mischke, President and Spiritual Leader of the Wisconsin Evangelical Lutheran Synod to the effect that the Synod's scriptural principles do not permit its pastors to accept appointment as military chaplains but that at its own expense and responsibility it has successfully conducted a *civilian* chaplaincy program under which its pastors have provided spiritual support for its members serving in the armed forces in the United States, Vietnam and Europe. For these activities the Army has provided logistical support including travel by military aircraft, transient quarters at full-service rates, exchange privileges, open mess privileges and use of military postal and banking facilities. In Rev. Mischke's opinion his Synod's civilian chaplains are fully effective in ministering to its members in mili-

tary service and do not unduly burden its finances.

In response to the Rev. Mischke's affidavit Gerhardt W. Hyatt, President of Concordia College, St. Paul, and Vice-President of the Lutheran Church Missouri Synod, who served as an Army chaplain in the United States, Europe, Guam, Korea and Vietnam at various times during the period from 1945 to 1975, rising to the position of Deputy Chief of Chaplains, and who is familiar with activities of civilian ministers of the Wisconsin Synod, gives a somewhat different picture in an October 1982 affidavit. He swears that there were no Wisconsin Synod civilian chaplains serving soldiers in certain U.S. locations; that their only religious support in locations in Europe where he was stationed was one week-end religious retreat; that during the period when he was on the staff of the Office of United States Army Europe in Europe, with which civilian clergy were required to coordinate, no coordination was requested by the Wisconsin Synod except for the one retreat; that in Vietnam, where Rev. Hyatt was Command Chaplain, Military Assistance Command, the Synod had only one clergyman at any time to minister to its members there, which made regular visits to members impossible; and that such civilian clergymen, unlike military chaplains, were not permitted to tend to the wounded on the battlefield but were restricted to secure "rear areas" and hospitals to which wounded were evacuated. Rev. Hyatt further averred that in 1970 officials of the Wisconsin Synod expressed concern over the fact that because of their civilian status they could not adequately tend to the spiritual needs of its members. Hyatt, in his 30 years experience in the Army chaplaincy, knew of no church other than the Wisconsin Synod whose clergy were not permitted to serve as military chaplains or who had undertaken at their own expense to serve their members in the military service. In Hyatt's view the religious support furnished by the Wisconsin Synod to its members in the Army was inadequate. Hyatt's affidavit was supported by that of Colonel Whitfield M. McMillan, Deputy United States Army Europe (USAREUR) Chaplain since 1981, who has had 26 years active duty service as a chaplain. In an October 1982 affidavit he attested to the security problem encountered in permitting access to military facilities by civilian clergy, the limited service rendered to the USAREUR by the two Wisconsin Synod civilian chaplains, and pointed out that in the event of hostilities they would be evacuated along with all other civilians.

Shortly after the commencement of the present action the district court, in an opinion by Judge Mishler, denied defendants' motion to dismiss the complaint, which was sought on the grounds (1) that plaintiffs lacked standing, (2) that the Army's chaplaincy program did not violate the First Amendment, and (3) that the complaint presented a political question not subject to judicial review. Relying principally on *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), Judge Mishler held that as federal taxpayers the plaintiffs had standing to attack Congress' appropriation of funds for the Army's operation of its chaplaincy. Dismissal on the merits was denied on the ground that from the complaint's allegations it did not appear that the plaintiffs could "prove no set of facts in support of [their] claim which would entitle [them] to relief," (citing quotation in *Sheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), from *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). Judge Mishler believed it conceivable that the chaplaincy is "so overly broad in scope as to constitute a governmentally sponsored program of religious proselytism, and at the same time sadly deficient in providing religious support services to members of certain religious faiths." He concluded that more facts were needed before the constitutional issue could be resolved.

There followed a period of discovery through interrogatories, production of documents and answers to requests for admission. In April 1982, following the Supreme Court's decision in *Valley Forge Christian*

*College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), defendants renewed their earlier motion, plaintiffs moved for summary judgment and defendants then cross-moved for summary judgment. In support of their motion defendants filed declarations of top command officers of the Army, including General Edward C. Meyer, its Chief of Staff, to the effect that because of the sheer size of the military population and the unique conditions under which our Army's military forces must function a military chaplaincy is essential and the services provided by it to soldiers could not effectively be furnished by civilian sources, particularly on the battlefield or in other crisis situations.

In a reasoned opinion dated February 1, 1984, 582 F.Supp. 463 (E.D.N.Y.1984), Judge McLaughlin reaffirmed the court's earlier recognition of plaintiffs' standing as federal taxpayers to bring the suit, holding that *Valley Forge, supra,* was distinguishable and did not render *Flast v. Cohen, supra,* inapplicable. However, relying heavily on *Rostker v. Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), he granted summary judgment dismissing the action on the ground that the court should defer to the decision of Congress in what is essentially a military matter, the feasibility of substituting a civilian chaplaincy in place of a military one. He concluded accordingly that the question of whether the Free Exercise rights of soldiers could be secured by an alternative civilian chaplaincy was one which he was "unequipped and unempowered to answer." From this decision plaintiffs appeal.

### DISCUSSION

■ The threshold question, whether plaintiffs have standing to litigate the constitutionality of the Army's military chaplaincy, need not detain us long. For reasons fully stated by Judges Mishler and McLaughlin, *see* 599 F.Supp. 987, and 582 F.Supp. at 467–71, we agree that as federal taxpayers the plaintiffs satisfy the two-pronged test of *Flast v. Cohen,* 392 U.S.

83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Unlike the issue in *Valley Forge, supra,* relied on by defendants, which involved only "a decision by HEW to transfer a parcel of federal property," 454 U.S. at 479, 102 S.Ct. at 762, the attack here is directly upon the constitutionality of Congress' exercise of its taxing and spending power under Const. Art. I, § 8.

Turning to the merits, the Establishment Clause of the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion," was designed by our Founding Fathers to insure religious liberty for our country's citizens by precluding a government from imposing, sponsoring, or supporting religion or forcing a person to remain away from the practice of religion. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance." (330 U.S. at 15–16, 67 S.Ct. at 511–512).

The Army chaplaincy does not seek to "establish" a religion according to this simple formula. It observes the basic prohibition expressed by the Court in *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952):

"The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction."

Since the program meets the requirement of voluntariness by leaving the practice of

religion solely to the individual soldier, who is free to worship or not as he chooses without fear of any discipline or stigma, it might be viewed as not proscribed by the Establishment Clause. Indeed, if the Army prevented soldiers from worshipping in their own communities by removing them to areas where religious leaders of their persuasion and facilities were not available it could be accused of violating the Establishment Clause *unless* it provided them with a chaplaincy since its conduct would amount to inhibiting religion. *Everson v. Board of Education, supra,* (the government can neither "force nor influence a person ... to remain away from church against his will....." *Id.* at 15, 67 S.Ct. at 511. "State power is no more to be used so as to handicap religions than it is to favor them." *Id.* at 18, 67 S.Ct. at 513).

Congress' authorization of a military chaplaincy before and contemporaneous with the adoption of the Establishment Clause is also "weighty evidence" that it did not intend that Clause to apply to such a chaplaincy. *See Wisconsin v. Pelican Ins. Co.,* 127 U.S. 265, 297, 8 S.Ct. 1370, 1377, 32 L.Ed. 239 (1888). Moreover, its "unambiguous and unbroken history of more than 200 years," *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 3336, 77 L.Ed.2d 1019 (1983), in continuing that course indicates that, as with the practice of opening legislative sessions with a prayer, "the First Amendment draftsmen ... saw no real threat to the Establishment Clause," *id.,* 463 U.S. at ——, 103 S.Ct. at 3335, arising from a military chaplaincy. In interpreting the Bill of Rights such "an unbroken practice ... is not something to be lightly cast aside." *Walz v. Tax Commission,* 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970); *see McGowan v. Maryland,* 366 U.S. 420, 429–49, 81 S.Ct. 1101, 1107–17, 6 L.Ed.2d 393 (1961).

To protect against the threat that our federal or state governments might by indirect legislation erode the protection of the Establishment Clause the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), laid down a strict test for determining whether a statute "respecting" religion meets the requirements of the clause: (1) it must have a secular legislative purpose; (2) its principal effect must be one that neither advances nor inhibits religion; and (3) it must not foster excessive governmental entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111–12. With two recent exceptions, *see Marsh v. Chambers, supra,* and *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), the Court has continued to use the *Lemon v. Kurtzman* test in resolving the constitutional permissibility of legislation attacked as violating the Establishment Clause.[3]

If the current Army chaplaincy were viewed in isolation, there could be little doubt that it would fail to meet the *Lemon v. Kurtzman* conditions. Although the ultimate objective of the chaplaincy may be secular in the sense that it seeks to maintain the efficiency of the Army by improving the morale of our military personnel, its immediate purpose is to promote religion by making it available, albeit on a voluntary basis, to our armed forces. The effect of the program, moreover, is to advance the practice of religion. Administration of the program, involving arrangements with many church organizations of different denominations, entangles the government with religious accrediting bodies.

■ However, neither the Establishment Clause nor statutes creating and maintaining the Army chaplaincy may be interpreted as if they existed in a sterile vacuum. They must be viewed in the light of the historical background of their enactment to the extent that it sheds light on the purpose of the Framers of the Constitution. *Walz v. Tax Commission,* 397 U.S. 664, 680, 90 S.Ct. 1409, 1417, 25 L.Ed.2d 697 (1970); *Abington School Dist. v. Schempp,*

---

**3.** *See Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982); *Stone v. Graham,* 449 U.S. 39, 40–41, 101 S.Ct. 192, 193– 194, 66 L.Ed.2d 199 (1980); *Wolman v. Walter,* 433 U.S. 229, 235–36, 97 S.Ct. 2593, 2598–99, 53 L.Ed.2d 714 (1977).

374 U.S. 203, 212–14, 83 S.Ct. 1560, 1565–67, 10 L.Ed.2d 844 (1963). They must also be considered in context, since a test which may be reasonable in one context may be wholly inappropriate in another. The Supreme Court, while noting that it found *Lemon* useful in some contexts, only recently reaffirmed its "unwillingness to be confined to any single test or criterion in this sensitive area," disclaiming a per se or "absolutist" approach and pointing out that even in *Lemon* it had stated that the Clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship," *Lynch v. Donnelly*, —— U.S. ——, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984). The need for some flexibility in this respect had earlier been recognized in *Walz v. Tax Commission, supra,* where the Court stated that

> "The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited.... Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." 397 U.S. at 669, 90 S.Ct. at 1411.

Aside from the fact that no single test will meet all contexts, the Establishment Clause must in any event be interpreted to accommodate other equally valid provisions of the Constitution, including the Free Exercise Clause, when they are implicated. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *see also Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (upholding school released time program for religious instruction outside city's school system).

The present case involves two other provisions of our Constitution, which must not only be respected but, to the extent possible, interpreted compatibly with the Establishment Clause. The first of these is the War Power Clause of Art. I, § 8, which provides in pertinent part that Congress shall have the power to "provide for the common Defence," "to raise and support Armies," and to "make Rules for the Government and Regulation of the land and naval Forces." Although military conduct is not immune from judicial review when challenged as violative of the Bill of Rights, *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983); *Gilligan v. Morgan,* 413 U.S. 1, 12 n. 16, 93 S.Ct. 2440, 2446 n. 16, 37 L.Ed.2d 407 (1973); *Laird v. Tatum,* 408 U.S. 1, 15–16, 92 S.Ct. 2318, 2326–2327, 33 L.Ed.2d 154 (1972); *Crawford v. Cushman,* 531 F.2d 1114 (2d Cir.1976), the Supreme Court has recognized that:

> "[J]udges are not given the task of running the Army.... The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

> "[W]e cannot go into the discriminatory character of his orders. Discrimination is unavoidable in the Army." *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–540, 97 L.Ed. 842 (1953).

In a perilous world our survival as a nation and our enjoyment of the blessings of liberty depend heavily upon our Army and other military institutions, rigid and disciplined as they must be. Those who want the individual liberty embodied in our Bill of Rights must be willing to make sacrifices for it. One of these is the duty of a soldier to obey military orders and forego many of the freedoms that he would otherwise enjoy as a civilian, including the right to travel whenever and wherever he pleases. As the Court noted in *Schlesinger v. Ballard,* 419 U.S. 498, 510, 95 S.Ct. 572, 578, 42 L.Ed.2d 610 (1975), "responsibility for determining how best our Armed Forces shall attend to [the] business [of fighting or being ready to fight wars should the occasion arise] rests with Con-

gress ... and with the President." As a result, "[w]hile the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." *Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974); *Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (First Amendment rights of Army officer limited); *Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976) (servicemen do not have Sixth Amendment right to counsel in summary court-martial proceedings).

■ The line where military control requires that enjoyment of civilian rights be regulated or restricted may sometimes be difficult to define. But caution dictates that when a matter provided for by Congress in the exercise of its war power and implemented by the Army appears reasonably relevant and necessary to furtherance of our national defense it should be treated as presumptively valid and any doubt as to its constitutionality should be resolved as a matter of judicial comity in favor of deference to the military's exercise of its discretion. *Rostker v. Goldberg,* 453 U.S. 57, 64–68, 101 S.Ct. 2646, 2651–2654, 69 L.Ed.2d 478 (1981).

■ The second provision of the Constitution which plays a vital role in our interpretation of the Establishment Clause is the Free Exercise Clause of the same Amendment. It is readily apparent that this Clause, like the Establishment Clause, obligates Congress, upon creating an

Army, to make religion available to soldiers who have been moved by the Army to areas of the world where religion of their own denominations is not available to them. Otherwise the effect of compulsory military service could be to violate their rights under both Religion Clauses of the First Amendment. Unless the Army provided a chaplaincy it would deprive the soldier of his right under the Establishment Clause not to have religion inhibited and of his right under the Free Exercise Clause to practice his freely chosen religion. As the Court stated in *Walz v. Tax Commission, supra,* 397 U.S. at 669–70, 90 S.Ct. at 1411–12:

"Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so. Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses has prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice."

Members of the Supreme Court have pointed to Congress' provision of churches and chaplains at military establishments as an example of an appropriate accommodation between the two Clauses. *See Abington School Dist. v. Schempp,* 374 U.S. 203, 296–98, 83 S.Ct. 1560, 1610–12, 10 L.Ed.2d 844 (Brennan, J., concurring), 308–09 (Stewart, J., dissenting).[4] Congress recognized

---

**4.** Referring to the military chaplaincy, Justice Brennan in his concurrence stated:

"There are certain practices, conceivably violative of the Establishment Clause, the striking down of which might seriously interfere with certain religious liberties also protected by the First Amendment. Provisions for churches and chaplains at military establishments for those in the armed services may afford one such example. The like provision by state and federal governments for chaplains in penal institutions may afford another example. It is argued that such provisions may be assumed to contravene the Establishment Clause, yet be sustained on constitution-

al grounds as necessary to secure to the members of the Armed Forces and prisoners those rights of worship guaranteed under the Free Exercise Clause. Since government has deprived such persons of the opportunity to practice their faith at places of their choice, the argument runs, government may, in order to avoid infringing the free exercise guarantees, provide substitutes where it requires such persons to be." [Footnotes omitted]. 374 U.S. at 296–98, 83 S.Ct. at 1610–12.

Justice Stewart expressed similar views in his dissent:

"The First Amendment declares that 'Congress shall make no law respecting an estab-

as early as 1850 that its failure to provide a chaplaincy would deprive soldiers of their Free Exercise rights. H.R.Rep. No. 171, 31st Cong., 1st Sess. (1850). The problem was also noted by the Court in *Abington School Dist. v. Schempp, supra,* 374 U.S. at 226 n. 10, 83 S.Ct. at 1573 n. 10:

> "We are not of course presented with and therefore do not pass upon a situation such as military service, where the Government regulates the temporal and geographic environment of individuals to a point that, unless it permits voluntary religious services to be conducted with the use of government facilities, military personnel would be unable to engage in the practice of their faiths."

The standard to be applied, therefore, in deciding whether the Army's military chaplaincy can survive attack as violative of the Establishment Clause must take into account the deference required to be given to Congress' exercise of its War Power and the necessity of recognizing the Free Exercise rights of military personnel. In our view these additional factors, which were not present in *Lemon v. Kurtzman* or its progeny, relied on by plaintiffs, render its test inappropriate here. On the other hand, we do not agree with the district

court that the doctrine of deference to Congress' judgment in military affairs leaves us powerless to review the constitutional permissibility of the military chaplaincy. In our view the test of permissibility in this context is whether, after considering practical alternatives, the chaplaincy program is relevant to and reasonably necessary for the Army's conduct of our national defense.

Applying these principles to the present case, we start with plaintiffs' concession that some chaplaincy is essential. Except for peripheral claims that a few practices of the government's military chaplaincy amount to "religious proselytism," their lawsuit hinges entirely on their contention that a privately funded chaplaincy, patterned on the present military program, would fully and fairly meet the government's needs under the War Power Clause and the free-exercise needs of military personnel. They state,

> "A civilian program could be comprised of the same individuals performing the same functions, with the Army exercising the same military control and providing the same logistical support, coordination and training in military affairs.

---

lishment of religion, or prohibiting the free exercise thereof...' It is, I think, a fallacious over-simplification to regard these two provisions as establishing a single constitutional standard of 'separation of church and state,' which can be mechanically applied in every case to delineate the required boundaries between government and religion. We err in the first place if we do not recognize as a matter of history and as a matter of the imperatives of our free society, that religion and government must necessarily interact in countless ways. Secondly, the fact is that while in many contexts the Establishment Clause and the Free Exercise Clause fully complement each other, there are areas in which a doctrinaire reading of the Establishment Clause leads to irreconcilable conflict with the Free Exercise Clause.

"A single obvious example should suffice to make the point. Spending federal funds to employ chaplains for the armed forces might be said to violate the Establishment Clause. Yet a lonely soldier stationed at some faraway outpost could surely complain that a government which did *not* provide him the opportunity for pastoral guidance was affirmatively

prohibiting the free exercise of his religion. And such examples could readily be multiplied. The short of the matter is simply that the two relevant clauses of the First Amendment cannot accurately be reflected in a sterile metaphor which by its very nature may distort rather than illumine the problems involved in a particular case." 374 U.S. at 308–09, 83 S.Ct. at 1616–17.

The necessity of reconciling the two Clauses was also noted by Justice Goldberg in his concurrence:

"The First Amendment's guarantees, as applied to the States through the Fourteenth Amendment, foreclose not only laws 'respecting an establishment of religion' but also those 'prohibiting the free exercise thereof.' These two proscriptions are to be read together, and in light of the single end which they are designed to serve. The basic purpose of the religion clause of the First Amendment is to promote and assure the fullest possible scope of religious liberty and tolerance for all and to nurture the conditions which secure the best hope of attainment of that end." 374 U.S. at 305, 83 S.Ct. at 1615.

Only the source of funding for substantive religious practice would differ." (Appellants' Reply Br. 17–18).

For the most part, we disagree.

To begin with, defendants have described in detail the various functions performed by the Army's chaplains and the inability of local civilian clergy or special organizations of civilian clergy to meet the religious needs of the many different denominations in the armed forces. They note that among the inadequacies of a civilian clergy would be the questionable ability of many denominations, particularly the smaller ones, to fund a civilian chaplaincy and the lack of training in the military subjects needed to enable the civilian chaplain to function effectively in the field.

In response to the detailed affidavits submitted by the defendants pursuant to Fed. R.Civ.P. 56(e) plaintiffs have not come forward with any evidence or offer through discovery or depositions to establish that the many religious denominations involved, including the principal Catholic, Protestant and Jewish organizations in the United States, would support and be willing to pay their respective shares of the $85 million required to operate a civilian chaplaincy and to provide such additional sums as may be required in case of war or national emergency. Nor have plaintiffs come forward with assurances from the numerous religious organizations involved that they would seek to agree upon each denomination's proportionate share of the overall financial obligation and that they would be able and willing to honor their respective obligations in the years ahead. It is obvious from the evidence offered by the defendants that without enforceable commitments on the part of these various denominations the Army would be unable to maintain a functioning civilian chaplaincy. Assuming hypothetically that such a program could be launched, it would constantly be teetering on the brink of disaster. An impractical alternative is no alternative at all. Since plaintiffs have not submitted affidavits furnishing "specific facts showing that there is a genuine issue for trial," as required by Rule 56(e), nor sought under Rule 56(f) a continuance to "permit affidavits to be obtained or depositions to be taken or discovery to be had" that would create such an issue but instead have rested on their general denial of the accuracy of the affidavits submitted by the defendants their response is insufficient to rebut the facts relied on by the defendants. *First National Bank v. Cities Service*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Wyler v. United States*, 725 F.2d 156, 160 (2d Cir.1983); *In Re B.D. Intern. Discount Corp.*, 701 F.2d 1071, 1077 n. 11 (2d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978).

In short, plaintiffs' proposal is so inherently impractical as to border on the frivolous. Absent some substantial evidence that it might be within the realm of the feasible, we do not believe that taxpayers, merely by instituting a lawsuit, are entitled to engage in a costly and time-consuming broad-scale investigation into an entirely speculative suggestion, made without an evidentiary basis for believing that the claim is well-grounded in fact. See Fed.R.Civ.P. 11. The sole evidence in support of plaintiffs' claim, the affidavits of the Rev. Carl H. Mischke of the Wisconsin Evangelical Lutheran Synod, even if accepted at face value, can hardly serve as an indication that the Catholic Church, the Jewish Religion, and the numerous other Protestant denominations would favor, much less financially support, a civilian chaplaincy.

Aside from the obvious financial infeasibility of appellants' alternative proposal, plaintiffs offer no evidence that civilian chaplains would accept military discipline, which is essential to the efficient operation of our armed forces. This discipline demands willingness to undergo thorough military training except in the use of firearms, to remain with an Army unit for a specified period of time, to obey orders to move overnight with that unit to other locations, which might be thousands of

miles away, and to advance as ordered on the battlefield and risk their lives in order to minister to the wounded and dying. Thus, since plaintiffs' suggested alternative of a civilian chaplaincy amounts to nothing more than speculation, unsupported by some showing of practical feasibility, it fails to survive the evidentiary showing advanced by the defendants.

Any doubt as to the feasibility of a civilian chaplaincy must in our view be resolved in favor of judicial deference to Congress' decision in this area, which is closely tied to the efficient functioning of our armed forces. It is significant that from time to time Congress rejected proposals for abolition of the military chaplaincy in favor of dependence on civilian or other alternatives, albeit on a smaller scale. *See, e.g.,* Mil.Aff.Doc. No. 651, 24th Cong., 1st Sess. (1836); S.Misc.Doc. No. 2, 30th Cong., 2d Sess. (1848); H.R.Rep. No. 124, 33rd Cong., 1st Sess. 7–8 (1854). In 1924 Congress, in deciding whether to increase the number of military chaplains, held joint hearings at which witnesses testified to the inability of the civilian clergy to meet the needs of soldiers and the ineffectiveness of civilian clerics, when compared with military chaplains, to deal with and control soldiers. *See, To Increase the Number of Chaplains in the Army: Hearings on S. 2632 and H.R. 7038 Before the Subcommittees of the Committees on Military Affairs of the United States Senate and the House of Representatives,* 68th Cong., 1st Sess. (1924). In 1973 the Senate Committee on Appropriations, after its House counterpart requested a review of the Army's needs for military chaplains, studied the issue and reported:

> "Civilian churches can care for some of the needs of service women and men but there are other profound daily needs that the denominational churches are not prepared to identify or meet. This is not the time in our history to diminish the moral and spiritual support which our nation has made available to its military personnel for two hundred years. Ministry to the men and women of our Armed Forces is a specialized ministry that re-

quires identification and loyal commitment to their peculiar needs.... the Committee does not consider it wise to impose arbitrary limitations on the presumption that someone else will do this important task." S.Rep. No. 93–617, 93rd Cong., 1st Sess. 66 (1973).

Thereafter Congress, having considered alternatives, adhered to the view that a military chaplaincy was essential and, despite substantial cutbacks in 1976 in the personnel of the armed forces, made only minimal reductions in the chaplaincy's staff. Under all of the circumstances, including plaintiffs' will-o'-the-wisp, factually unsupported proposal for a civilian chaplaincy, Congress' continuation of the military chaplaincy after such consideration should be respected and upheld.

Lastly, even if plaintiffs' proposal were feasible it would, assuming the *Lemon* standard advanced by the plaintiffs were held applicable, violate the Establishment Clause. The Army, financed by Congress, would to at least some extent still be commanding the civilian chaplains and supporting them with taxpayer-provided "logistical support, coordination and training in military affairs" (Appellants' Reply Br. 18), including transport, food and facilities.

■ We find that the more appropriate standard of relevancy to our national defense and reasonable necessity is met by the great majority of the Army's existing chaplaincy activities. The purpose and effect of the program is to make religion, religious education, counseling and religious facilities available to military personnel and their families under circumstances where the practice of religion would otherwise be denied as a practical matter to all or a substantial number. As a result, the morale of our soldiers, their willingness to serve, and the efficiency of the Army as an instrument for our national defense rests in substantial part on the military chaplaincy, which is vital to our Army's functioning.

■ In a few areas, however, the reasonable necessity for certain activities of the

military chaplaincy is not readily apparent. For instance, it appears that in some large urban centers, such as at the Pentagon in Washington, D.C., in New York City and San Francisco, government funds may be used to provide military chaplains, facilities and retreats to "armchair" military personnel who, like other government civil servants, commute daily to their homes and spend their free hours (including weekends) in locations where civilian clergy and facilities are just as available to them as to other non-military citizens. Plaintiffs also assert that government-financed Army chaplains and facilities are provided to retired military personnel and their families. If the ability of such personnel to worship in their own communities is not inhibited by their military service and funds for these chaplains and facilities would not otherwise be expended, the justification for a governmental program of religious support for them is questionable and, notwithstanding our deference to Congress in military matters, requires a showing that they are relevant to and reasonably necessary for the conduct of our national defense by the Army. A remand therefore becomes necessary to determine whether, according to the standard we have outlined, government financing of a military chaplaincy in these limited areas for the purposes indicated is constitutionally permissible.

Accordingly, the order of the district court is affirmed except to the extent so remanded. Costs to the appellees.

MESKILL, Circuit Judge, concurring and dissenting.

Because I believe that no remand is required, I would affirm the order of the district court in its entirety. I dissent from so much of the majority's decision as reverses and remands to the district court.

Judge Mansfield describes the alternative proposal to the present chaplaincy program advanced by the plaintiffs—who, incidentally, have never served in the military—as "so inherently impractical as to border on the frivolous." I agree. Judge Mansfield continues:

Absent some substantial evidence that it might be within the realm of the feasible, we do not believe that taxpayers, merely by instituting a lawsuit, are entitled to engage in a costly and time-consuming broad-scale investigation into an entirely speculative suggestion, made without an evidentiary basis for believing that the claim is well-grounded in fact. See Fed. R.Civ.P. 11.

Majority Op. at 236.

Given the breadth of these conclusions, I see no reason for us as an appellate court to subject chaplaincy services for retired military personnel and chaplaincy program activities in large urban areas (e.g., at the Pentagon and in New York City) to further and deeper analysis. In my opinion, the fringe activities of the chaplaincy program that would be examined under the majority's remand are not of constitutional magnitude. Investigation into these peripheral services performed by some military chaplains amounts to little more than judicial nit-picking. Where, as here, the plaintiffs have failed in their basic constitutional attack on the funding of the chaplaincy program, we would do well to exercise judicial restraint and limit our decision to the disposition of the broad-scale attack mounted by the plaintiffs.

I surmise that the remand ordered by the majority will serve only to burden the district court and the parties with a purposeless task. Indeed, a few moments of reflection suggest what the results of continued factfinding will likely be. It is common knowledge that retired military personnel frequently settle near a military installation where they have post exchange and commissary privileges and free medical service. Whether such retirees attend religious services on military bases or seek counseling from military chaplains does not seem to me to warrant further judicial inquiry on the record before Judge McLaughlin.

Some high ranking officers in the chaplaincy program are undoubtedly stationed at the Pentagon. That is to be expected at Department of Defense headquarters.

Some of these officers may also officiate at religious services, just as Popes and Bishops continue to say Mass in addition to their hierarchical duties. There has been no showing here that any services performed at or around the Pentagon are attended by other than military personnel on duty at the time rather than military personnel stationed in the Washington, D.C. area who live in the suburbs. Considering the distances military personnel would have to travel to attend such services, such practices would be highly unlikely.

I would affirm the order of the district court in its entirety.